UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.: 8:13-cv-00624-SDM-TBM

LORI BLAGG, on her own behalf and
others similarly situated,

       Plaintiff,

v.

DATEX, INC., a Florida corporation,

       Defendant.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
## FOR FINAL SUMMARY JUDGMENT

      Plaintiff, LORI BLAGG, responds as follows to Defendant's Motion for Final Summary Judgment:

### I.       Introduction

      Defendant's basis for seeking summary final judgment based on the exemption defenses is based heavily on the representations Ms. Blagg made in her resume.  However, in doing so, Defendant ignored authority that provides that resumes do not provide the most accurate picture of an employee's duties because they are enhanced and tailored to help the employee obtain employment.  What is important is evidence showing what the employee does on a day to day basis.  In this action, Ms. Blagg has contemporaneous timesheets which Defendant required her to complete and submit, which detail the work she performed on a day to day basis.  These time sheets demonstrate that Ms. Blagg's primary duties were data entry, billing and running reports.  These duties do not support a finding that Ms. Blagg is exempt under the administrative because her primary duties were repetitive, nondiscretionary tasks.  Further, there is no evidence that Ms.

Blagg hired, fired, or supervised employees, or that she had any involvement in significant change of status of employees, which would implicate the executive exemption.  Ms. Blagg also did not have the level of education that would qualify as a "prolonged" course of study, resulting in the applicability of the professional exemption.  As a result, Defendant has not provided enough evidence to show that Ms. Blagg "plainly and unmistakably" fits within these exemptions.

Defendant is also not entitled to summary judgment on the basis of a setoff because Ms. Blagg earned the vacation time that she took.  It was not a gratuitous benefit.  Additionally, the Fair Labor Standards Act does not permit an off set of vacation time, against unpaid overtime. Finally, Defendant's overtime policy does not relieve it of liability for overtime compensation because Ms. Blagg was ordered to prepare and submit timesheets, which she did.  These timesheets put Defendant on notice that Ms. Blagg worked overtime hours.  Having been put on notice, Defendant was obligated to pay Ms. Blagg overtime compensation.

Accordingly, Ms. Blagg respectfully requests that this Court deny Defendant's Motion for Final Summary Judgment.

## II.        Statement of Disputed Facts.

### A.  Ms. Blagg's Employment with Defendant.

Ms. Blagg was hired by Defendant in approximately August 2008.  Compl. [D.E. 1] at ¶3.  Initially, Ms. Blagg worked in the support department until she was given the title "Project Accounting Manager" in approximately March 2011.  Blagg depo. Vol. I. at 28:3-10; Compl. [D.E. 1] at ¶4.  Ms. Blagg was then given the title "Director of Operations" in August 2012.  At that time, neither her duties nor her salary changed.  Blagg depo. Vol. II at 6:19-7:5; Blagg depo. Vol. I at 35:16-20.  The period at issue in this action is between March 2011 and the end of Ms.

Blagg's employment in January 2013, when she worked under the titles "Project Accounting Manager" and "Director of Operations."  Compl. [D.E. 1] at ¶¶ 4-5.

### B.  Ms. Blagg's Supervisors.

When Ms. Blagg was employed by Defendant, Samir Armanious was the President.  S. Armanious depo. at 6:20-24.  In that position, he oversaw the company's entire operations.  S. Armanious depo. at 6:25-7:6. Additionally, Michael Armanious was the Vice President of Sales and Marketing; Derek Armanious was the Vice President of Services and Installations; and Andy Armanious oversaw development.  S. Armanious depo. at 8:16-19; 8:20-21; 8:24-25.  Finally, Joseph Guinther was the Controller, and then the Chief Financial Officer.  Mr. Guinther's job was to oversee the finances of the company.  Guinther depo. at 8:4-7.

### C.  Ms. Blagg's Educational Background and Resume.

Ms. Blagg became certified in project management for information technology professionals in February 2009.  Blagg depo. Vol. I 25:14-23; 26:8-9.  However, Ms. Blagg did not use those skills in performance of her duties between March 2011 and the end of her employment with Defendant.  Blagg depo. Vol. I at 52:15-18.  After obtaining her Project Management certificate, Ms. Blagg sought employment as a project manager.  Ms. Blagg tailored her resume to such a position.  On her resume, Ms. Blagg did not include data entry as a duty because she did not want to "go backwards" in her career path.  She wanted to proceed on a path to becoming a project manager, and used her resume to market herself to potential employers for such a position.  Blagg depo. Vol. I at 35:1-5; Vol. II at 35:10-15.  The resume Ms. Blagg submitted to Ultimate Medical Academy was tailored to obtaining employment as a project manager.  Blagg depo. Vol. II at 35:19-21.  Similarly, when Ms. Blagg was seeking a position which she could be considered overqualified, she understated her skills and

qualifications to tailor them to the position for which she was seeking employment. Blagg depo. Vol. I at 26:22-25.

In her deposition, Ms. Blagg was asked about select items on her resume, and she testified explaining what they meant in the context of her duties while employed by Defendant between March 2011 and January 2013. Ms. Blagg also explained that the majority of the entries on her resume were presented in an effort to "sell herself" to prospective employers as a project manager. Ms. Blagg explained that "plan, direct and coordinate" activities refers to her putting in all the data into the CRM[1] system, creating cases, creating payment records, and putting payment records into Defendant's CRM system. Blagg depo. Vol. I at 36:14-20. With respect to "approving timesheets", Ms. Blagg reviewed timesheets to make sure that they matched up so that invoices could be created for them. Blagg depo. Vol. II at 50:1-3; 7-8. "Create or approve" all project related billings to customers entailed entering the contract into Defendant's system so it could be billed. Blagg depo. Vol. II at 52:10-13. To approve invoices, Ms. Blagg would go through her spreadsheets, or insert the information into Defendant's AutoTask system for "approved invoices," and then click the "approve" button to send it to the accountants. Blagg depo. Vol. II at 107:20-108:14.

Ms. Blagg's position as "Project Accounting Manager" did not require any degrees or certifications. S. Armanious depo. at 49:19-21; 50:5-7. In fact, Ms. Blagg did not have the qualifications for the "Project Accounting Manager" or "Director of Operations" positions, in light of the fact that Shelly Smart (Defendant's previous Director of Operations) was a Certified Public Accountant, and had a master's degree in business administration, which Ms. Blagg did not have. D. Armanious at depo. 11:3-5.

---

[1] CRM means Customer Regulation Management. 54:16-17.

### D.  Ms. Blagg's Duties from March 2011 to January 2013.

Between March 2011 to January 2013, Ms. Blagg's primary duties were entering new contracts into spreadsheets, closing out cases and entering them into spreadsheets, and updating spreadsheets.[2]  Blagg depo. Vol. II at 18:5-7:11.  When Ms. Blagg got a new signed contract, she would enter the information for the customer into the spreadsheet, as well activities and milestones, including the amounts due at certain stages within the project.[3]  This was done so reports could be generated.  Blagg depo. Vol. I at 19:6-11; 13:5-20.

Ms. Blagg also monitored when expiration dates were within the projects so she could send letters to clients advising them their contracts were expiring.  When it was time to bill customers, Ms. Blagg would enter all of the billing items and invoices into the accounting system to generate batch log.  Ms. Blagg would then review and reconcile[4] the entries, and then send an email to the accountants to let them know that the batch had been entered and was ready for invoices to be sent to customers.

Ms. Blagg used various spreadsheets to perform her duties.  These include the Deferred Revenue Spreadsheet, the Projects in Process Ledger and the Project Review Spreadsheet.  See NOF Ex. 9.  The Deferred Revenue Spreadsheet was used to track support contracts.  Blagg depo. Vol. I at 55:19-25; 56:1-10.  With respect to the Projects in Process Ledger, when there was a new contract, Ms. Blagg would enter the amount of the contract into that spreadsheet.  That would show how much money was due by customers.  Blagg depo. Vol. I at 57:18-24.  The

---

[2] In an email, Ms. Blagg summarized her duties as program management, resource management, contract management and support management.  This referred to the data entry she performed for these tasks.  Blagg depo. Vol. I at 33:12-34:7.

[3] Datex's typical schedule for contract payments was a 50/20/20/10 system.  Under this system, Defendant would charge customers 50% upfront, 20% due at install of the software, 20 % due 60 days thereafter, and 10% at a later time.  Blagg depo. Vol. I at 18:1-7.

[4] Reconciling means making sure the data entered in the spreadsheets was correct.   Blagg depo. Vol. I at 43:1-4.

Project Review Spreadsheet contained all the transactions over the course of a week. Blagg depo. Vol. I at 59:14-15.

Ms. Blagg attended project review meetings. Blagg depo. Vol. I at 55:14-18. These meetings were led by Derek Armanious 80% of the time. Duncan depo. at 15:5-13; 16:3-5. Ms. Blagg also attended individual meetings with Defendant's project managers. The purpose of the meetings was to gather information from the project managers as to whether they had fulfilled certain milestones within the projects. Duncan depo. at 17:5-18:3. Ms. Blagg would simply ask whether certain items were completed, and she would get a "yes" or a "no". If a task was not done, it would have to be deferred to someone else higher up, such as Derek Armanious, to decide what to do. Duncan depo. at 19:1-9; 20:5-11; 21:19-24.

It was not Ms. Blagg's decision as to whether milestones could be moved. Project milestones were established by the original contract, which Michael, Andy, Derek or Samir Armanious would have established with the customer at the beginning stages of the project. The only time Ms. Blagg entered milestones was when she would physically type and copy the milestone from the printed, signed customer contract into the computer system. Ms. Blagg never "generated" milestones herself. Duncan depo. at 22:16-23:9. Therefore, if milestones had to be adjusted, they would have to flagged, and brought to Derek Armanious for a decision. Duncan depo. at 18:4-9. Ms. Blagg never helped Ms. Duncan resolve or find solutions for any problems she had with a project. Duncan depo. at 47:16-19.

### E.   Ms. Blagg's Hours of Work and Defendant's Overtime Policy.

Ms. Blagg usually started work by 7:00am or 8:00am, and ended her work day between 5:00pm and 7:00pm. Blagg depo. Vol. I at 44:15-19; 61:6-7. There were times she worked on weekends as well. Blagg depo. Vol. II at 12:4-15. Ms. Blagg was instructed to keep track of the

time she worked, which she did on timesheets.  Blagg depo. Vol. I at 83:14-19.  Specifically, in

an email dated June 12, 2012, Michael Armanious instructed Ms. Blagg and other employees to

submit timesheets every week.  NOF Ex. 10.  Michael Armanious told Ms. Blagg that she would

be compensated for the overtime hours she worked.  However, she was not compensated for that

time.  Blagg depo. Vol. I at 47:4-12; 68:17-25; 69:1-11.  Although Defendant contends it

enforces a policy requiring overtime to be approved before it is worked, Mathew Kaferlein, a

former salaried employee with Defendant, worked overtime during his employment and did not

have to obtain permission to do so.  Kaferlein depo. at 13:12-13.

### F.  Ms. Blagg's Timesheets Demonstrate That Her Primary Duty Was Non-Exempt Data Entry Work.

In accordance with Defendant's instructions, Ms. Blagg accurately completed and

submitted her timesheets.[5]  Blagg depo. Vol. II at 69:23-25.  The entries Ms. Blagg submitted on

her timesheets demonstrate that her primary duty was the performance of data entry and clerical

work, which she spent virtually her entire work days performing.  Select entries are outlined in a

chart below.

| Date | Entry |
|------|-------|
| 7/23/12 | Run case report[6], review closed cases, send email of shortage of cases, run milestones and add, update milestones, add support payments due. Run expired contracts this month and next. Update new contracts and send renewal letters for D&S, Vanguard, Kyrie, High Track. Follow up on Vertex billable case and close. Recog interest income revenue. Respond to Vanguard renewal questions and add to billables spreadsheet. Update and close West Case billable after hour case. Schedule Oscar to complete Boomgard. Review emails. |
| 8/22/2012 | Emails, timesheet, proof software invoices, Autotask-project/contract/milestone/invoice testing, work order/resource management, create |

---

[5] Ms. Blagg did not include lunch or breaks in the time she recorded on the timesheets. She only recorded the time she was working, and how long it would take her on each task.  Blagg depo. Vol. II at 70:13-16; 70:24-71:2.

[6] On the timesheets, "run case reports" means Ms. Blagg had to run reports at the beginning of every week to see what had to be billed and entered into the spreadshseet so cases could be closed.  Blagg depo. Vol. II at 71:9-14.  To do this, she would go into the system, enter a couple of buttons, put in a couple of dates and click a button that said "run."  This was data entry work.  Blagg depo. Vol. II at 71:9-23.

|  | 2 new contracts |
|---|---|
| 10/2/12 | Review emails, software invoicing, update all backend ss[7] for quarter end, setup NR spreadsheet with 2 new accounts, project review. Proof invoices, correct invoices for Rosedale, send date to Rosedale per request, software invoicing. Assist High Track |
| 10/8/2012 | Run case report, verify cases closed, update spreadsheet, run payment records and add to ss, discuss Livsmart support invoice, discuss support contracts needed in AT, explain items to invoice to Joe to pass to him, run expired contracts for last month and this month and verify, update Davy and Lutheran. |
| 12/7/2012 | Review, follow up on 700+ emails; correct Wolverine invoice; update accts with PM changes; update payment dates on several invoices; review payment from Elinx without an invoice with Salwa; create invoice for Enlinx; confirm and recor payment date for Enlinx; request update on CAN invoice template from AT; review outstanding quotes for billing; run milestone report[8] and review outstanding for project meeting; send report to PMs; email invoices created on Tuesday and Wednesday; catch up filing; correct taxes on Global account; recreate invoice with correct taxes; update Sharepoint page. |
| 12/20/2012 | No lunch; review and follow up on emails; update timesheet; prepare PO templates for request to AT; review new CAN invoice modified by AT; meeting with Joe and Kim; invoice remaining December recurring billing; complete approval for CAN invoice; review pick slip; modify example and sent to AT for quote; send PO to AT for corrections; follow up on Merchants shipment; create files for new accounts and file contracts; work on Kim's CRM request, discussed with her and she decided that is no longer needed; add credit for Rosedale SSL and correct invoice; unlock Mina's account; research support contracts to start Rosedale, SabeRex, Valley and EverCold; update support ss; emailed all invoices. |

NOF Ex. 8.

### G.    Ms. Blagg Made No Significant or Executive Decisions Between March 2011 and June 2013.

Between March 2011 and January 2013, Ms. Blagg did not manage or direct the work of Defendant's employees.  After she was given the "Project Accounting Manager" title, Derek Armanious supervised the support staff, as well as the project managers.  Blagg depo. Vol. I at 14:16; 16:7-10; 18-21; 23:7-9; 55:1-3.  Michael, Derek, Andy and Samir Armanious were the only individuals at Datex who could make decisions about hiring employees, terminating

---

[7] "SS" stands for spreadsheet.
[8] To run milestone reports, Ms. Blagg would do the same thing as she did for running case reports.  She would go into the computer, click a button.  Blagg depo. Vol. II at 72:2-6.

employees, and how much employees got paid. S. Armanious depo. at 7:7-8:15. There is no evidence Ms. Blagg recommended pay increases, assessed the performance of Defendant's employees or reprimanded employees. S. Armanious depo. at 73:3-5; 78:13-15; 97:15-21. Ms. Blagg did not interview, or suggest or recommend the hiring of individuals by the company after 2011. Blagg depo. Vol. I at 53:1-6. Ms. Blagg also did not suggest termination of any employees. Blagg depo. Vol. I at 53:12-17. Significantly, Ms. Blagg also was not involved in budgeting, nor was she involved in determining what resources went into a contract. That was done by Derek Armanious . Blagg depo. Vol. I at 54:24-25; 54:19-23.

In his deposition, Samir Armanious identified one employee who was allegedly terminated by Ms. Blagg between March 2011 and January 2013. This employee was Wesley Jones, who worked for the company until October 2012. S. Armanious depo. at 72:10-32; 10:10-13. However, Mr. Jones testified that he voluntarily resigned his employment with Defendant and was not aware of any discussion relating to any alleged termination of his employment. Jones depo. at 10:14-16. Further, according to Defendant, one project manager Ms. Blagg allegedly supervised was Laura Duncan, who worked for Defendant from November 2009 to June or July of 2012. S. Armanious depo. at 56:1-4; Duncan depo. at 7:2-5. Ms. Duncan became a Project Manager at the end of 2010 or early 2011. Duncan depo. at 10:19-11:3. However, Ms. Duncan testified that when she became a project manager, her supervisor was Derek Armanious, not Ms. Blagg. Duncan depo. at 11:13-22; 24:9-15. Ms. Blagg supervised Ms. Duncan when Ms. Blagg was a Support Manager (before March 2011), not when she was titled "Project Accounting Manager" or "Director of Operations". Duncan depo. at 10:5-8.

### H.  Defendant's Paid Time Off Policy.

As part of her compensation, Ms. Blagg also earned accrued vacation time based on Defendant's paid time off policy.   Blagg depo. Vol. II at 11:4-5.   Defendant's Employee Handbook was effective on January 1, 2011. NOF Ex. 7.   Defendant's paid time off policy provides that employees receive one PTO day per complete calendar month worked, for a total of 12 PTO days for each full anniversary of employment, and 6 additional PTO days upon completing 3 years of employment for a total of 18 days (1.5 days accrued per month. NOF Ex. 7 at 13-14.

### III.      Memorandum of Law

### A.       Standard of Review.

"Summary judgment is appropriate if the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citations omitted). The summary judgment movant bears the initial burden of showing the court, by reference to the record, that no genuine issues of material fact exist to be determined at trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The movant meets this burden by showing that there is an "absence of evidence to support the non-moving party's case." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593 (11th Cir. 1995).  The Court's role at the summary judgment stage is not to weigh the evidence or to determine the truth of the matter, but to rather to determine whether a genuine issue exists for trial.  Thomas v. Jones Restaurants, Inc., 64 F.Supp.2d (M.D. Fla. 1999) citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  In doing so, the Court must view the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of that party.  Id.

**B.      The General Provisions of the FLSA.**

The FLSA provides that employees are generally entitled to receive overtime pay at one and one-half times their regular rate for all hours worked in excess of forty per week. See 29 U.S.C. § 207(a)(1).  The FLSA exempts from its overtime pay requirements "any employee employed in a bona fide executive, administrative, or professional capacity." See 29 U.S.C. § 213(a)(1); see also Avery v. City of Talladega, 24 F.3d 1337, 1340 (11th Cir. 1994). The employer has the burden of showing entitlement to an exemption, Jeffery, 64 F.3d at 594, and the Courts construe overtime exemptions narrowly, against the employer. Avery, 24 F.3d at 1340 (citing Brennan v. Sugar Cane Growers Co-Op, 486 F.2d 1006 (5th Cir. 1973)).  The Eleventh Circuit has recognized the "Supreme Court's admonition that courts closely circumscribe the FLSA's exceptions." Nicholson v. World Bus. Network, Inc., 105 F.3d 1361, 1364 (11th Cir. 1997).

**C.      Defendant Has the Burden to Clearly Prove Every Element of the Administrative, Executive and Professional Exemptions.**

To prevail on their asserted exemption defenses, **Defendant has the burden to establish that Ms. Blagg fits "plainly and unmistakably within the terms and spirit of every element of [an] exemption**." Corning Glass Works v. Brennan, 417 U.S. 188, 196-97 (1974) (emphasis added); Nicholson v. World Bus. Network, Inc., 105 F.3d 1361, 1364 (11th Cir. 1997).  As a result, where an employer cannot establish each element, the entire exemption defense necessarily fails, as a matter of law.  See Nicholson, 105 F. 3d at 1364.  "The criteria provided by the regulations [interpreting the FLSA] are **absolute** and the employer must prove that any particular employee meets every requirement before the employee will be deprived of the protection of the Act." Mitchell v. Williams, 420 F.2d 67 (8th Cir. 1969) (emphasis added).

**D.      Ms. Blagg's Resume Does Not Provide the Most Accurate Picture of Her Duties Between March 2011 and January 2013.**

Defendant relies heavily on Ms. Blagg's resume to support its argument that Ms. Blagg is exempt from the overtime provisions of the FLSA.  In rejecting this very approach, one court has opined:

> The defendant contends that the court should discredit the plaintiffs' deposition testimony because it is allegedly inconsistent with their resumes.  The court does not find this argument persuasive.  **It is unsurprising that an employee would choose to emphasize in a resume managerial tasks, such as hiring or training new employees, over non-managerial tasks, such as cleaning the bathrooms or bringing in carriages, even where the managerial tasks took up significantly less of the employee's time**. Morrison v. Ocean State Jobbers, Inc., 2013 U.S. Dist. LEXIS 40010, at *45 n.10 (D. Conn. Mar. 22, 2013); *Ale v. TVA*, 269 F.3d 680, 689 n.2 (6th Cir. 2001) ("**resumes may not provide the most accurate picture of an employee's job because resumes are typically designed to enhance the employee's duties and responsibilities in order to obtain a job**"); Wolfslayer v. IKON Office Solutions, Inc., 2005 U.S. Dist. LEXIS 1106, at *29 (E.D. Pa. Jan. 26, 2005) ("**statements [on resumes] must be taken with a grain of salt**") (emphasis added).[9]

The key to determination of whether an employee is covered by an exemption to the FLSA overtime requirements does not depend on an employee's general characterization of his or her job in a resume designed to enhance the employee's duties and responsibilities to obtain a job.  "**What is important is what an employee actually does on a day-to-day basis**.'" Perkins v. So. New England Tel. Co., 669 F. Supp. 2d 212, 219 n.3 (D. Conn. 2009) (emphasis added).

The same principles apply here.  Ms. Blagg obtained certification as a project manager in 2009.  As a result, she tailored her resume to market herself toward that career path.  Ms. Blagg understated her skills in resumes if she was potentially overqualified for job, so she could tailor

---

[9] Accord Perkins v. So. New England Tel. Co., 669 F. Supp. 2d 212, 219 n.3 (D. Conn. 2009) ("'The key to determination of whether an employee is covered by an exemption to the FLSA overtime requirements does not depend on an employee's general characterization of his or her job in a resume designed to enhance the employee's duties and responsibilities to obtain a job . . . .  **What is important is what an employee actually does on a day-to-day basis**.'")

her resume to that position.  Ms. Blagg's resume that was submitted to the Court, as tailored, does not reflect the duties Ms. Blagg performed on a day to day basis between March 2011 and January 2013.  The timesheets she completed on a daily basis, however, specifically outline the duties she performed, and are much more reliable in assessing the true nature of her duties.  The time records show that Ms. Blagg performed a plethora of clerical and data entry duties, which are not exempt duties under the FLSA's professional, administrative or executive exemptions.

### E.      The Administrative Exemption.

Under Department of Labor regulations, an employee qualifies for the administrative exemption if (1) the employee is compensated on a salary or fee basis not less than $455.00 per week; (2) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  Id. at 541.200(a).  **However, a defendant's characterization of the job responsibilities is not sufficient to demonstrate that the work actually performed was exempt**. See Cooke v. General Dynamics Corp., 993 F. Supp 56, 61 (D. Conn. 1997) (**Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a job title or job description**) (emphasis added); Demos v. City of Indianapolis, 126 F. Supp. 2d 548, 559 (S.D. Ind. 2000) (Regulations require analysis of the employee's activities and prohibit reliance on job titles; reliance on the employer's characterization of those activities through an employer-created job description is similarly suspect).  Further, Court's do not simply slap on a talismanic phrase in determining the primary duty of an employee, and concluding he is a manager.  Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1272 (11th Cir. 2008) ("Family

Dollar's 'in charge' label strikes us a away to bypass a meaningful application of the fact-intensive factors…we reject that 'categorical approach'").

Here, there is no dispute that Ms. Blagg meets the FLSA's salary basis test.  With respect to Ms. Blagg's day to day duties, Ms. Blagg's time sheets are the best evidence of the duties she performed on a day to day basis.  These timesheets reflect that Ms. Blagg's primary duties were not directly related to the management or general business operations of the company.  Instead, they were: (a) receiving Defendant's contracts; (b) entering the deadlines into Defendant's computer systems and spreadsheets; (c) monitoring deadlines in the spreadsheets; (d) revising the deadlines as directed by Derek Armanious and the project managers; (e) entering the billing information necessary for invoicing; and (f) running reports.[10]  Ms. Blagg exercised no discretion in performing these tasks.  Ms. Blagg simply obtained the contracts from Defendant's employees and entered them into the computer system and spreadsheets so the deadlines could be monitored, and billing could be sent to customers.  Even the act of "approving" invoices did not involve discretion because Ms. Blagg did not make the decision as to whether an item could be billed.  She simply hit a button that said approve so the information she entered could be billed by accounting.  Plaintiff spent well in excess of 50% of her work days performing these tasks.  In fact, the time sheets reflect that she spent virtually 100% of her work days performing these data entry, information collection and clerical tasks.

Even in meeting with project managers, Ms. Blagg's job was to simply collect information from them as to the status of the projects to determine whether milestones she had entered into the computer had been attained, and whether they could be invoiced.  Ms. Blagg had no authority to make decisions regarding modifying milestones.   The milestones were

---

[10] Even one of Ms. Blagg's coworkers, Wesley Jones, was aware that Ms. Blagg's duties were "setting up new customers" and "doing billing". Jones depo. at 14:11-17.

established by a contract negotiated by Andy, Derek, Michael or Samir Armanious.   Any decision to modify the milestones had to be made by upper management, including Derek Armanious.   there is also no evidence that ms. Blagg made significant decisions such as negotiating or giving directions to employees.   Indeed, Ms. Duncan testified that if she ever had a problem with a project for which she needed a solution, she never discussed it with Ms. Blagg (because Ms. Blagg had no authority to make such decisions).   Therefore, based on the record evidence, Ms. Blagg is not administratively exempt under the FLSA.

### F.    The Executive Exemption.

To establish an employee is a <u>bona</u> <u>fide</u> executive, an employer must show: (1) the employee is compensated on a salary basis at a rate of not less than $455 per week; (2) the employee's primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) the employee customarily and regularly directs the work of two or more other employees; and (4) the employee has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a).

Again, there is no dispute that the salary basis test is met.   However, the 3 remaining elements are in dispute.   Ms. Blagg's primary duty was not management of Datex, Inc. nor a customarily recognized division of it.   Defendant has not identified in its Motion the divisions of Datex, Inc. that Ms. Blagg runs.   Further, Ms. Blagg's timesheets do not reflect that she was running any particular division of Datex, Inc. or the company itself.   There is no evidence Ms. Blagg was involved in budgeting, handling employee complaints or grievances, disciplining employees, negotiating or monitoring legal and compliance measures, which are duties required to establish that she was involved in "management.[11]"

---

[11] Ms. Blagg incorporates herein her arguments relating to Ms. Blagg's primary duties under section III E regarding the Administrative Exemption.

Apart from Defendant's barebones allegations in the Motion and supporting affidavits that Ms. Blagg supervised employees, there is no evidence to that effect because Defendant has not identified any specific employees in the affidavits.  In Samir Armanious' deposition, he contends Ms. Blagg supervised Laura Duncan.  But Ms. Duncan testified that Derek Armanious supervised her as a project manager.  There is also no evidence Ms. Blagg had authority or made recommendations regarding hiring, firing, advancement promotion or any other change of status of employees.  Defendant has provided no evidence that Ms. Blagg hired or terminated any employees between March 2011 and January 2013.  Samir Armanious testified in his deposition that Ms. Blagg terminated Wesley Jones.  But Mr. Jones testified he **voluntarily** resigned his employment with Defendant.  Defendant has provided no further evidence that Ms. Blagg reprimanded employees, determined their rates of pay, or was involved in any decisions regarding change of status of employees.  To the contrary, Samir Armanious testified that the only people who involved in the hiring, firing or determining rates of pay of employees were himself, Derek, Michael and Andy Armanious.  Consequently, Defendant has failed to demonstrate that the executive exemption applies.

### G.    The Professional Exemption.

To qualify for the learned professional exemption, an employee's primary duty must be the performance of work **requiring** advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction.  Specifically, the elements of this exemption require that: (a) the employee be paid on a salary or fee basis of not less than $455.00 per week; and (b) the employee perform work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction.

Here, as an initial matter, Samir Armanious testified that the "Project Accounting Manager" position had no educational requirements.  Further, Ms. Blagg could not fully perform

all of the duties Ms. Smart performed as the the Director of Operations[12] because her education was not comparable to Ms. Smart (who held the position before). Ms. Smart was a CPA and possessed a master's degree in business administration. Whereas Ms. Blagg possessed a Project Manager's Certificate, and two associates degrees, one of which was not even related to the position. An associate's degree is generally a 2 year degree, which is not "prolonged" course of specialized intellectual instruction. Based on these facts, it follows that Ms. Blagg could not have assumed all of the duties of the Director of Operations, and the only duties she performed are clerical and data entry duties reflected in her timesheets. Ms. Blagg cannot qualify for the executive exemption because the positions she allegedly had and the duties associated with them "*required*" prolonged instruction, which Ms. Blagg never underwent. Consequently, Ms. Blagg is not executively exempt under the FLSA.

### H.   Defendant is Not Entitled to a Setoff Against Ms. Blagg's Damages Because Vacation Pay is Not Subject to Setoff in an FLSA Action.

It is well established that fringe benefits such as meals, health insurance, bonuses, and **paid vacations** cannot be applied to offset wages in an FLSA action. Morrison v. Executive Aircraft Refinishing, Inc., 434 F.Supp.2d 1314 (S.D. Fla. 2005); Dunlop v. Gray-Goto, Inc., 528 F.2d 792 (10th Cir. 1976) (reversing trial court's order offsetting fringe benefits, including vacation and holiday pay, in FLSA overtime action); Futrell v. The Columbia Club, Inc., 338 F.Supp. 566 (S.D. Ind. 1971) (holding that vacation pay should not be offset against overtime due); Martin v. PepsiAmericas, Inc., 628 F.3d 738 (5th Cir. 2010) (vacating trial court's order applying setoff of a severance payment to employee).[13]

---

[12] Interestingly, Ms. Blagg has never seen the document listing the duties of the Director of Operations for Datex, Inc.. Blagg depo. Vol. I at 35:25-36:3.

[13] In its analysis, the Court explained that federal courts were not designated by the FLSA to be either collection agents or arbitrators for an employee's creditors. The only function of the federal judiciary

Further, under Florida law, vacation pay is considered "wages". <u>Strasser v. City of Jacksonville, Florida</u>, 655 So.2d 234 (Fla. 1st DCA 1995). Under Florida law, "wages" includes any compensation given to a hired person for his or her services. Every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, **vacation** pay, **dismissal wages**, bonuses, and reasonable value of board, rent, lodging, payments in kind, tips, and any other similar advantage received from the individual's employer or directly with respect to work for him. <u>Elder v. Islam</u>, 869 So.2d 600 (5th DCA 2004) (citing Coleman v. City of Hialeah, 525 So.2d 435 (Fla. 3d DCA 1988) (emphasis added).

As an initial matter, Samir Armanious, while testifying as Defendant's corporate representative, testified that the company does not feel Ms. Blagg owes it any money. <u>See</u> S. Armanious depo. at 109:15-17. Ms. Blagg's vacation pay is **earned** wages because she was required to work for a full month to earn 1 vacation day (or 12 months to get 12 vacation days). She was then required to work 3 years to gain another 6 vacation days. As a result, Ms. Blagg's vacation days were not gratuitous payments from Defendant. Ms. Blagg was required to perform for a specific period of time to accrue those wages. Having been duly earned, these payments cannot be offset against Ms. Blagg's unpaid overtime wages.[14]

With respect to the time frame for which Ms. Blagg is entitled to recover damages, Defendant cannot limit Ms. Blagg's damages to the time from June 2013 to the end of her employment. Defense counsel's inquiry regarding the time frame during which Ms. Blagg sought "overtime" sought a legal conclusion, which Ms. Blagg, a lay person, cannot provide.

---

under the FLSA is to assure to employees of a covered company a minimum level of wages. <u>Martin</u>, 628 F.3d at 741.

[14] Even assuming a setoff could apply (which it does not), Defendant has made no consideration for liquidated damages, which, if applied, does not eliminate Ms. Blagg's overtime damages assuming she worked 15 overtime hours each week.

Ms. Blagg specifically testified during her deposition that she has not had any training or education in the FLSA.  Blagg depo. Vol. II at 107:2-9.

I.   **Defendant's Policy Regarding Overtime Does Not Relieve It From Liability for Overtime Compensation Because Ms. Blagg's Timesheets Put It On Notice of the Overtime Hours Ms. Blagged Worked.**

The regulations interpreting the FLSA caution that "work not requested but suffered or permitted is work time." 29 C.F.R. § 785.11. "The reason an employee continues to work beyond his shift is immaterial; if the employer knows **or has reason to believe** that the employee continues to work, the additional hours must be counted." Id.  In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. **The mere promulgation of a rule against such work is not enough**. Management has the power to enforce the rule and must make every effort to do so. 29 CFR 785.13. "An employer's knowledge is measured in accordance with his "duty . . . to inquire into the conditions prevailing in his business." Reich v. Dept. of Conservation and Natural Resources, 28 F.3d 1076 (11th Cir. 1994) (reversing District Court's finding that employer was not liable for overtime based on employer's prohibition against overtime where there was evidence the employer had actual knowledge that employees worked overtime, and the employer took no steps to ensure employees did not work overtime).  "The cases must be rare where prohibited work can be done . . . and knowledge or the consequences of knowledge avoided." Id. at 1082. In reviewing the extent of an employer's awareness, a court need only inquire whether the circumstances were such that the employer either had knowledge of overtime hours being worked or else had the opportunity through reasonable diligence to acquire knowledge.  Id. Knowledge of a supervisor is imputed to the employer, and it is sufficient that a manager or supervisor, acting with reasonable diligence, had the opportunity to acquire the knowledge.

<u>Ladegaard v. Hard Rock Concrete Cutters, Inc.</u>, 2004 U.S. Dist. LEXIS 16288 (N.D. Ill. June 25, 2004) (holding overtime work was covered by FLSA where as many as 3 supervisory employees were aware of employees working overtime hours); <u>Chao v. Gotham Registry, Inc.</u>, 514 F.3d 280, 287 (2d Cir. 2008) (holding that overtime work provided by employees, which was recorded on time cards that were submitted to the employer was work time requiring compensation although employer had a policy requiring approval of overtime work before it was performed).

In this case, Defendant cannot claim it had no knowledge that Ms. Blagg worked overtime hours.  Ms. Blagg was instructed by Michael Armanious to complete and turn in timesheets each week, which she did.  By those timesheets, Defendant was put on **actual** notice that Ms. Blagg routinely worked in excess of 40 hours per week.  Even if Ms. Blagg did not turn in timesheets, it was Defendant's duty to investigate whether Ms. Blagg submitted the timesheets and determine how many hours she worked.  From there, Defendant could have determined that Ms. Blagg was working overtime.[15]

WHEREFORE, based on the foregoing authority, evidence and arguments, Ms. Blagg prays that this Court deny Defendant's Motion for Final Summary Judgment, and grant any other relief the Court deems just.

---

[15] Samir Armanious testified that even if Ms. Blagg sought permission to work overtime, it is Defendant's position that even if her overtime was approved, she would not receive the pay anyway because she was a salaried employee.  S. Armanious depo. at 116:13-17.  This contention demonstrates that even if Ms. Blagg requested permission to work overtime, the request would have been futile.  Therefore, there was no reason for her to have asked permission to work overtime.

Dated: December 2, 2013                          Respectfully submitted,
       Boca Raton, Florida

                                                 **s/CAMAR R. JONES**
                                                 Camar R. Jones, Esq.
                                                 Florida Bar No. 720291
                                                 E-mail: cjones@shavitzlaw.com
                                                 SHAVITZ LAW GROUP, P.A.
                                                 1515 South Federal Highway, Suite 404
                                                 Boca Raton, Florida  33432
                                                 Telephone: (561) 447-8888
                                                 Facsimile: (561) 447-8831
                                                 Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2013, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

**s/CAMAR R. JONES**
Camar R. Jones

## SERVICE LIST
***Blagg v. Datex Inc.***
***Case No.: 8:13-cv-00624-SDM-TBM***
***United States District Court for the Middle District of Florida***

Vincent B. Lynch, Esq.
E-mail:    vincent@execlawgroup.com
Executive Law Group
3001 N. Rocky Point Dr. E, Suite 208
Tampa, Florida 33629
Telephone: 813-367-3505
Attorneys for Defendant
Served via CM/ECF